BURKE v. SOUTHERN PAC. R. CO. OF CALIFORNIA.

(District Court, S. D. California, S. D.    April 2, 1915.)

1. PUBLIC LANDS ⊘88 — GRANTS IN AID OF RAILROADS — CONSTRUCTION — "AND."

Act March 3, 1871, c. 122, 16 Stat. 573, authorized the construction of the Texas Pacific Railroad, and in section 9 granted public lands in aid thereof, but provided that all such lands not sold or disposed of within three years after completion of the road should be subject to settlement and pre-emption at a price not exceeding $2.50 per acre. Section 23 authorized the Southern Pacific Railroad to construct a line connecting with the Texas Pacific, with the same rights, grants, and privileges, "and" subject to the same limitations, restrictions, and conditions as were granted the Southern Pacific by Act July 27, 1866, c. 278, 14 Stat. 292. The act of 1866 in section 3 granted public lands to the Atlantic & Pacific Railroad, with no provision relative to pre-emption and settlement, and in section 18 authorized the Southern Pacific to construct a line connecting therewith, and provided that it should have similar grants of land subject to the conditions and limitations therein provided. Held, that the lands granted to the Southern Pacific Company by the act of 1871 were not subject to pre-emption and settlement, though not sold within three years, as the rights, grants, and privileges referred to in section 23 were those of the grant of 1866, and, moreover, the provision as to pre-emption and settlement was one of the things which might aptly be described as "limitations, restrictions, and conditions," which concededly were the limitations, restrictions, and conditions of the grant of 1866, and the contention that, since the word "and" connotes something additional to that which has preceded, the rights, grants, and privileges

referred to must be those of a different grant than the grant to which the words "limitations, restrictions, and conditions" refer, is unsound.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 235, 266–269; Dec. Dig. ☞88.

For other definitions, see Words and Phrases, First and Second Series, And.]

2. PUBLIC LANDS ☞70—GRANTS IN AID OF RAILROADS—CONSTRUCTION.

That political considerations entered into the drafting and enactment of a railroad land grant, that it was "put over" by the railroad through the malign influence of its agents, and that prior to its enactment Congress and the people had determined that no more railroad land grants should be made, unless they contained a pre-emption clause, could not be considered, if true, in construing the grant.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 231, 236; Dec. Dig. ☞70.]

In Equity. Suit by Edmund Burke against the Southern Pacific Railroad Company of California. On motion to dismiss. Motion granted.

Edmund Burke, of Los Angeles, Cal., in pro. per.
Chas'. R. Lewers, of San Francisco, Cal., for defendant.

BLEDSOE, District Judge. This is a suit in equity to compel the defendant to execute a conveyance of certain premises, situate in the county of Imperial, state of California, to the plaintiff. In support of his claim for such relief the plaintiff alleges that the defendant railroad company obtained the title to the land in question, a certain half section, under and pursuant to the act of Congress of March 3, 1871 (16 Stat. 573, c. 122), subject to the condition that all land so acquired by the said defendant, which was not sold or otherwise disposed of within three years subsequent to the completion of its railroad, should be open to settlement and pre-emption, and should be sold and disposed of to settlers, at a price not exceeding $2.50 per acre, to be paid to said railroad company by the purchaser of such land. The plaintiff then alleges, in apt language, the facts tending to show that he is entitled to a conveyance of the precise land in question.

In my judgment, the question at issue being merely one of law, arising upon a motion to dismiss, is of such simplicity as that, in ordinary cases, the court would content itself with the making of a formal order granting the motion. Plaintiff, who appears in propria persona, however, asserts in his brief that:

"As a matter of fact nearly 500 claims (similar to the one at bar) have been filed, and several hundred new ones are being prepared for filing, and as a matter of fact those filings have cost the claimants from $37.50 to $100 per file, plus a contingent fee to be paid by each claimant, under certain circumstances, to various persons and attorneys."

Under this state of facts, the question at issue would seem to be of considerable importance to divers individuals in rather large numbers, who apparently are divesting themselves of their good money, in the belief, seemingly engendered by the advice of plaintiff, acting as their counsel, that a valid cause of action, based upon an appropriate tender of money and demand for deed, can be stated against this defendant.

Feeling, therefore, that other parties are likely to be led into litigation which this court confidently believes will be fruitless, I am led to state the reasons for my rulings herein at some length, in order that they may be clearly understood, and their force and significance appreciated.

[1] By the act of March 3, 1871, above referred to, which purported to incorporate the Texas Pacific Railroad Company, and to aid in the construction of its railroad, the United States government, by act of Congress, empowered the Texas Pacific Railroad Company to lay out, locate, and construct a railway and telegraph line, from the eastern line of Texas, through El Paso and Yuma, to "Ship's Channel," in the bay of San Diego, in this state. By section 9 of that act, "for the purpose of aiding in the construction of the railroad and telegraph line, herein provided for," there was thereby granted to the said Texas Pacific Railroad Company every alternate section of public land, not mineral, to the amount of 20 alternate sections per mile, on each side of said railroad line, as such line might be adopted by said company, through the territories of the United States, and 10 alternate sections in California. Said section 9 contained, however, the following important provision, essentially new to many of the railroad land grant statutes:

"And provided further, that all such lands, so granted by this section to said company, which shall not be sold, or otherwise disposed of, as provided in this act, within three years after the completion of the entire road, shall be subject to settlement and pre-emption like other lands, at a price to be fixed by and paid to said company, not exceeding an average of $2.50 per acre for all the lands herein granted."

In subsequent sections of the act suitable provision was made for the filing of a map of the route, and designation thereby of the lands which should vest in the railroad company under the above-mentioned provision.

It is admitted by both sides herein that the motif underlying the passage of the Texas Pacific grant was a desire on the part of Congress to give an outlet from the Southern states to the Pacific coast; the other railroad grants, for which provision had been theretofore made, having benefited the Northern states rather than the Southern. One faction in Congress was extremely desirous that this outlet for the Southern states should provide for an entry of the Texas Pacific Railroad into the city of San Francisco; the other faction, apparently not desiring to provide for a "grant-aided" railroad paralleling the Southern Pacific and Atlantic & Pacific to San Francisco, contended that the road should be built only to San Diego. The bill was up for consideration and passage in the final days of the Forty-First Congress, and on the last day of the session the conference committee, which had charge of the bill at that time, reported as a compromise measure the bill as it had been substantially framed theretofore, and in addition reported a new section, being section 23, the last section of the bill, and the interpretation of which gives rise to the present controversy. By enactment of the bill as originally introduced, together with this compromise section tacked on by the conference committee, the Southern states were given a road from New Orleans to San Diego, and the

Southern Pacific Railroad was given the right to connect its main line running from San Francisco to the Colorado river (which was to connect with the Atlantic & Pacific) by a road running from Mojave to Yuma. In this wise an outlet was given to the Southern states to San Francisco, as urged by the supporters of that plan, but it was given through the medium of the Texas Pacific as far as Yuma, and from Yuma to San Francisco over the Southern Pacific. Section 23, which became the basis of the compromise between the two factions, as enacted, is as follows:

"That, for the purpose of connecting the Texas Pacific Railroad with the city of San Francisco, the Southern Pacific Railroad Company of California is hereby authorized (subject to the laws of California) to construct a line of railroad from a point at or near Tehachapa Pass, by way of Los Angeles, to the Texas Pacific Railroad at or near the Colorado river, with the same rights, grants, and privileges, and subject to the same limitations, restrictions, and conditions, as were granted to said Southern Pacific Railroad Company of California, by the act of July twenty-seventh, eighteen hundred sixty-six: Provided, however, that this section shall in no way affect or impair the rights, present or prospective, of the Atlantic & Pacific Railroad Company or any other railroad company."

The act of July 27, 1866 (14 Stat. 292, c. 278), to which the above reference is made, was an act of Congress of the United States, providing for the construction, and granting lands in aid thereof, of a railroad to be built from Springfield, Mo., to the Pacific Ocean, by the Atlantic & Pacific Railroad Company. It was provided therein that such road should proceed, as near as might be suitable, along the thirty-fifth parallel of latitude. (This parallel, it might be said, in passing, lies a few miles north of Needles and a few miles south of Mojave, in this state.) Suitable provision was made in the act for the construction of the road, and the designation of its route across the continent; and by section 3 thereof there was granted to the railroad company 20 alternate sections of land per mile on each side of the right of way through the territories and 10 alternate sections on each side of the right of way in the states through which it passed, mineral lands excepted. There was, however, no provision in the act similar to that in section 9 of the act of 1871, with reference to the settlement and pre-emption of the lands granted to the railroad company. By section 18 of this act it was provided:

"That the Southern Pacific Railroad, a company incorporated under the laws of the state of California, is hereby authorized to connect with the said Atlantic & Pacific Railroad, formed under this act, at such point, near the boundary line of the state of California, as they shall deem most suitable for a railroad line to San Francisco, and shall have a uniform gauge and rate of freight or fare with said road; and in consideration thereof, to aid in its construction, shall have similar grants of land, subject to all the conditions and limitations herein provided, and shall be required to construct its road on the like regulations, as to time and manner, with the Atlantic & Pacific Railroad herein provided for."

The contention in this case, and the only point in controversy herein, has to do with the interpretation of section 23 of the act of 1871. Plaintiff's theory, and his right to demand a deed of the defendant, is based upon the belief entertained by him that the grant of lands to the Southern Pacific under said section 23 is subject to the provision

hereinabove referred to, attached to the grant made to the Texas Pacific, that such grants not sold within three years should be open to settlement and pre-emption like other government lands. In this behalf he urges that section 23 should be construed so that the phrase "with the same rights, grants, and privileges" should refer to the Texas Pacific grant, rather than to the Southern Pacific grant of 1866. The section, it will be remembered, after authorizing the construction of the road by the Southern Pacific, affixes to that authorization these words:

"With the same rights, grants, and privileges, and subject to the same limitations, restrictions, and conditions, as were granted to the Southern Pacific Railroad Company of California by the act of July 27, 1866."

Does the first phrase of this clause refer to the Texas Pacific grant, and the last phrase refer to the Southern Pacific grant, or do they both refer to the same grant, to wit, the one specifically mentioned, that of the Southern Pacific of 1866? To my mind there is hardly room for debate upon the proposition. It would be a strained use of language which would permit of a reference to two different grants within the limits of the phraseology just quoted. In my judgment, the natural, reasonable, and immediate inference to be drawn from a consideration of the language used is that the grant to the Southern Pacific was to be in all substantial respects similar to the grant to the same company which had been made in 1866. If it had been the intention of Congress that the "rights, grants, and privileges" given to the Southern Pacific were to be similar to those given to the Texas Pacific, but that the "limitations, restrictions, and conditions" of the same identical grant were to be subject to the provisions of an entirely different grant, authorized many years previously, it seems to me that, beyond a peradventure of a doubt, more apt language indicative of that end would have been used by Congress in that behalf.

In addition, it may be said that the qualification or condition subsequent, which the plaintiff herein is seeking to fasten by interpretation upon the grant authorized by section 23, falls within the category of things which might aptly be described and referred to as "limitations, restrictions, and conditions," rather than as "rights, grants, and privileges." So that, if Congress had intended to clog the grant to the Southern Pacific with the condition now sought to be imposed upon it by plaintiff herein, it would have made the grant subject to the "limitations, restrictions, and conditions" of the Texas Pacific grant, rather than of the older Southern Pacific grant. Adopting counsel's interpretation, however, the things which were in fact "limitations, restrictions, and conditions" were not those of the Texas Pacific, where the pre-emption clause is found, but those of the Southern Pacific, where no such clause was inserted.

Counsel's argument, which has more of length than of logic to commend it, is based upon the theory that the word "and" in said section 23, which follows the reference to "rights, grants, and privileges," and precedes the use of the words "limitations, restrictions, and conditions," connotes something *additional* to that which has preceded, and must mean, therefore, that the matter preceding the word "and" "must

be matter outside of the grant of July 27, 1866, and in that event it must refer to the act of March 3, 1871." Disregarding the obvious non sequitur productive of this conclusion, it may be said that this contention arises out of the definition of the word "and" as given in the Century Dictionary, wherein it is said that there is no exact synonym of the word in English, but that it is expressed approximately by "with, along with, together with, besides, also, moreover," all of which, without doubt, do express the idea of addition, as suggested by plaintiff. The same definition, however (Cent. Dict. sub nom. "And"), calls attention to the fact that the elements which are connected by the word "and" must be "grammatically co-ordinate." This grammatical co-ordination is easily apparent if the elements preceding and succeeding the use of the word "and" refer to the same subject-matter. They are not co-ordinate, in my judgment, if one refers to a grant contained in the same act, and another refers to a grant contained in an entirely different act.

In addition, I cannot believe that, if Congress had intended that the "rights" of one act and the "limitations" of another act were to be superimposed upon the grant to the Southern Pacific, they would have made use of the two very expressive phrases, "*same* rights, grants, and privileges," and "*same* limitations, restrictions, and conditions." In other words, if plaintiff's construction were correct, Congress would have said, possibly, "with the same rights, grants, and privileges," referring to the Texas Pacific grant, "and subject to the limitations, restrictions, and conditions as were granted to said Southern Pacific," etc. In other words, if there had been an intention to differentiate the "rights" from the "limitations," the second use of the word "same" would have been omitted. Having used it, it is almost demonstration, in my judgment, that Congress intended that the word "same" in each instance should refer to the same subject-matter, namely, the grant made to the Southern Pacific in 1866.

In this connection, plaintiff argues that the use of the word "same" in qualification of "rights, grants, and privileges" shows that Congress did not intend by that phraseology to refer to the "rights, grants, and privileges" theretofore granted to the Southern Pacific Railroad Company, because, ex vi termini, "it would be physically impossible, as different routes between different terminals were called for," and then, with a candor and ingenuousness both novel and refreshing, he alleges that the words "same rights, grants, and privileges" refer only to the "grants and conditions that passed to the Texas Pacific Railroad Company." In other words, he contends that, though it would be a physical impossibility to make the "same" grants to the Southern Pacific between Mojave and Yuma as were made to the Southern Pacific between Mojave and Needles, it would be possible to, and Congress did, make the "same" grants to the Southern Pacific between Mojave and Yuma as were made to the Texas Pacific between New Orleans and San Diego. The argument, of course, proves too much, for, if it proves an impossibility in the one instance, it also proves it in the other, and leaves the phrase hanging in the air, so to speak, with nothing to which it can be attached.

These contentions, I think, exhibit their own irrefutable unsoundness and demonstrate the utter untenability of the position assumed by plaintiff herein.

[2] That, as has been claimed by plaintiff, political considerations entered into the final drafting and enactment of this bill, that it was "put over" by the Southern Pacific through the malign influence of its agents in Washington, and that, prior to its passage, Congress and the people had determined that no more land grants in aid of railroads should be made, except they contained the pre-emption clause, are matters wholly beside the question to be determined herein. They are arguments ad hominem, pure and simple, and throw no light upon the question of law addressed to the court. My sole duty is to determine the legislative intention of Congress in enacting section 23 of the act of 1871. In arriving at such determination I can consider only the language used, giving to that language its usual signification, and am not to be swayed by arguments that are unsuited to this forum, and have no relevancy to the question of law addressed to me.

I can come to no other conclusion than that the intention of Congress was, as gathered from its apt, expressive, unequivocal, and unambiguous language, that the Southern Pacific Railroad Company should receive a grant of land along both sides of the road to be constructed from Mojave, through Los Angeles, to Yuma, of the same general nature, and subject only to the same conditions and limitations as specified in the grant to the same road for the similar purpose of constructing its line from Mojave to Needles; that there is nothing from which it could be rationally deduced or inferred that Congress intended that the grant to the Southern Pacific was to be clogged with the condition imposed upon the grant to the Texas Pacific; and that for this court so to declare would be for it to usurp the legislative functions of the government and to set at naught the plainest principles of statutory interpretation and constitutional justice.

It might be said, in closing, that the Supreme Court of the United States (Southern Pacific Railroad Co. v. United States, 189 U. S. 447, 23 Sup. Ct. 567, 47 L. Ed. 896), in considering the said section 23 (with reference to another matter, however), followed the obviously natural construction adopted hereinabove, and held that the grant to the Southern Pacific was " 'with the same rights, grants, and privileges, and subject to the same limitations,' etc., as in the act of July 27, 1866" (189 U. S. 449, 23 Sup. Ct. 568, 47 L. Ed. 896. So, also, on page 450, of 189 U. S., on page 568 of 23 Sup. Ct., 47 L. Ed. 896, the court said: "The Texas Pacific act refers to the act of July 27, 1866, for the rights conferred on the Southern Pacific." These declarations of the supreme judicial authority of the land are not controlling in this case, perhaps, but they are very persuasive of the fact, as adverted to hereinbefore by me, that plaintiff's construction of the section in question would be a most strained, unnatural, and extraordinary one.

The motion to dismiss is granted.